Ms. Priebliner? Good afternoon, Your Honors, and may it please the Court. The District Court committed a series of legal errors in this case, but two errors were particularly fundamental, one going to liability and one going to damages. On liability, the District Court was wrong to split from every other court to consider the issue by rejecting the inquiry notice standard of accrual for the statute of limitations in the trade secrets context. On damages, the District Court's award of avoided cost damages is duplicative of the permanent injunction, which cuts off any ability to use the asserted trade secrets and so already prevents any enrichment to EOFlow from having avoided the cost of developing those secrets. I want to begin by talking about the statute of limitations issue in this case, because it was a central problem that existed from the outset of the case, and it's an issue that, if it's resolved in our favor, would take care of all of the issues we've raised on appeal. So you try to get around the Merck case by suggesting there was an established rule before the enactment of the federal statute. Could you address that? I'm not sure that I see that, and there may be one or maybe two Court of Appeals cases and some District Court cases, but I don't see an established practice for inquiry notice under the Uniform Trade Secrets Act. Well, absolutely, Judge Dyke. I'm happy to address that, and I think it's important to focus not just, of course, on how the courts have interpreted the Defend Trade Secrets Act after it was enacted in 2016, but as your question touched on, also the Uniform Trade Secrets Act, because it's undisputed that Congress, when it enacted the statute, was expressly trying to track the accrual language from the UTSA context, and I think that also makes relevant all of the State misappropriation statutes that were likewise modeled on the UTSA. And it's not just a case here or there. It's not like this was a one-off rule with just a couple of circuits or just a couple of District Courts. We've cited dozens of cases in our brief that all uniformly held that the statute begins to run at the moment of inquiry notice. That is, the first moment where the plaintiff perceives that there's a real potential problem here, and a reasonable person would start investigating. In other words, near suspicion. Well, I think it goes a little beyond near suspicion. So it's not just a hunch or blatant speculation, for example. But when you have the kind of inquiry notice that the District Court recognized existed here, where the plaintiff perceived that there was a product that was in its own words a clone of its own product, and specifically tied that to the fact that there were former employees of Insulet who were now employed by EOFLOW, who had had access to all of the asserted trade secrets in this case, courts have recognized that that's not just near suspicion. That's real notice that there's a potential problem. And what it does is it triggers this affirmative duty to investigate, because Congress did not want plaintiffs who have that kind of notice to just sit back and sit on their hands and not undertake the most basic steps to try to understand whether they can resolve the problem, what exactly is going on, and to file suit if necessary to resolve the problem. Have you answered Judge Dyke's question yet? I didn't think so. I mean, I've been saying there are lots of cases, but some of those cases really are not clear that they're applying inquiry notice like C-TRAC. I mean, I'm not sure that inquiry notice and the discovery rule is all that different, because if you look at some of those cases, C-TRAC is an example, what they say is that even under the discovery standard, that if you have access to the trade secrets and there's similarity in the product, that's sufficient to satisfy the discovery standard. And one of my questions ultimately is going to be whether that's the situation that we have here. But Judge Post, do you have more on the statutory standard? Yeah, I do. I do. I guess it's hard for me, and I know there's a lot and there are other cases, and it does a lot to distinguish the cases and what we're talking about. One, the Epstein case, I think, preceded the statute. The other case coming out of Iowa was dealing with a different statute with different language. So why don't we look at the statutory language? Because that's where I start, begin, and end, and I can compare it to the language in Merck and conclude that they're not different. But why don't we just look at the DTSA? It runs the clock from the date on which the misappropriation is discovered. Begin and end there. And then it adds, or the exercise of reasonable diligence should have been discovered. And I don't see daylight, so you can tell me why I'm wrong, between the statutory language and the jury instruction, which is the subject of the challenge this morning in this case. Well, sure. So let me try to take on both portions of those questions. And I want to focus first on the statutory language, because I think the key language here, and this is what provides a relevant distinction from Merck in response to Judge Dyke, is the second part of the accrual standard that you just read, Judge Post. That is the reference to the exercise of reasonable diligence by which the misappropriation should have been discovered. So that's Congress writing into the statute an express focus on the exercise of reasonable diligence, which naturally calls to mind conducting an investigation when you're put on notice that there might be a problem. And that, in fact, is how the lower courts had routinely interpreted this language in the context under the UTSA and the state misappropriation context, where the statutes did use very similar language. And so what did the court – where did the court go astray in the jury instruction? Because the jury did, presumably, and you're not challenging this on a fact basis, the jury looked at this language and said, did they exercise reasonable diligence? Would it be – in the absence of reasonable diligence, would this have not been discussed? Where – what's wrong with the language in the instruction? So there were two problems with the jury instruction. I want to say at the outset that we think that we were entitled to summary judgment on this issue, as the district court itself recognized, that if it's inquiry notice as we understand it, then this should never have gone to a jury. But even just drilling down on the jury instructions, I think there were two critical problems here. And the first is that the district court specifically rejected our request to instruct the jury on inquiry notice, and instead didn't just stop at the statutory language, but then provided the jury with additional instruction about the kinds of considerations they could take into account that would only be relevant after some point of inquiry notice, after part of the investigation has occurred. So I think that was one problem. The second problem is that the district court specifically said that jurors should think about a hypothetical reasonably diligent company and not look at the actual actions of insolent in this case. And that's error two under the inquiry notice standard, because courts have uniformly recognized both before and after enactment of the DTSA that this is a standard that creates an affirmative duty by Congress on trade secret owners to actually do something when they perceive the kind of problem that gives rise to inquiry notice. So I think that that was a problem also in the jury instructions, because the district court could have misled jurors into thinking that they should just hypothesize about what a speculative investigation would have looked like, and instead, they were never prompted to think about Insolent's actual lack of reasonable diligence here. There were all kinds of things that Insolent could have done at the moment that recognized the similarity of the products and said this is a clone, it was sounding alarm bells internally, and when it also recognized that its former employees who had been centrally involved in the design of the product were now working at EOFLOW and were centrally involved in the design of the competing product. They could have, for example, checked their own access logs or files to see if they could discern whether information had been misappropriated. They could have come to EOFLOW and reached out to those former employees and given them a reminder of their confidentiality obligations, or perhaps asked them, do you have any confidential documents? They could have sought the return of those documents. They could have sent a cease and desist letter. And I think just going back to the case law and looking at how other courts have adjudicated limitations issues in the trade secrets context, the fact pattern here reflects an astonishing level of recognition of a problem, alarm internally. Insolent said we told our lawyers we should try to get samples. But then inexplicably, they never undertook some of those basic steps of investigation that courts have provided. I don't think this was on your list of what you wanted to cover this morning, and I certainly want to hear the damages, which I think you did call out. I don't understand your objection to the jury instruction on reasonable measures. What did – what, in your view, did they do that they shouldn't have done? I mean, you talk about a temporal limitation. I don't know if you're complaining about – I don't – I'm not sure what you're complaining about in this instruction other than the global thing that they put some temporal limitation in. So let me try to be clear about our concern about the instruction. We think that it's clear under governing law that in a situation like this one where you have an assertion of a continuing misappropriation, so it's not like Insolent is just saying this was a trade secret in the past, but when it was misappropriated, but it's kind of fallen out of any veneer of secrecy. Instead, when you've got a company that's saying it remains a trade secret to this day, then it's reasonable to look at whether the company is taking reasonable measures to protect the secrecy of the information for the duration. And we think that the jury instruction on reasonable measures could have instead erroneously led the jury to think that they could only take into account the measures at the time of the initial misappropriation. Now, I, of course, acknowledge that the Court said you can think about post-misappropriation. Kagan. But it refers to the alleged misappropriation, which I think is the continuing misappropriation that you're talking about. So I'm just not seeing it. You want to tell me what's the problem with the exact language? It says, at the relevant time, and it says that. Yes. That's exactly it, Judge Prost. It's that at the relevant time language because it's suggesting to the jurors that there's a singular pinpoint in time where  But then it defines relevant time, doesn't define it, but it says, again, it's up to you to determine whether they took reasonable measures to keep the disputed information secret as of the time of the alleged misappropriation. Is there anything wrong with that? Well, again, I think that in combination with the fact that the district court then referred to the relevant time, just a few sentences later, could have naturally led jurors to think that they should consider only the misappropriation, for example, in 2018 with respect to some of the asserted trade secrets, and not take into account the lack of reasonable measures, particularly after Insolite perceived the problem and said there might be an IP issue we should investigate, but didn't do anything to protect secrecy. Okay. I did want to have a chance to briefly address damages, if I could. I have one question. Oh, of course. Before we get there. Let's assume hypothetically for the moment that you lose on inquiry notice point and that we're dealing with a discovery standard. The cases C-TRAC and others suggest that the fact that you have an access situation, that is to the trade secrets, and similarity in the product is sufficient as a matter of law to invoke the discovery standard. You argue, as I understand it, that that's the case here. And I'm focusing particularly on the Canula trade secret and the discovery standard. Yes, Judge Dyke. So I agree with you entirely in how you've articulated the legal principle, which is that access and similarity can combined create as a matter of law accrual even under a discovery standard. And here, the evidence with respect to the Canula was that in 2018, so we're now five years before Insolite filed suit, the Canula was prominently advertised at a 2018 trade conference event that Insolite attended. This is reproduced at page 7 of the Blue Brief, where we actually have the poster where the soft Canula with that flat nail head design that was alleged to be a trade secret was put on the promotional poster. The product itself, which would reflect all of the relevant dimensions in the CAD files, was likewise on display, a prototype, at that 2018 conference. And the evidence shows and was documented that Insolite went back and said, they've cloned our product. It bears a stunning resemblance. There were other emails that talked about how it was identical. And so I think this evidence demonstrates that Insolite itself perceived the overlap, right? So recognized that there was a striking, stunning resemblance and a cloned product. And then those very same emails tie it to the fact that there are former high-level people from Insolite who are now working at CEOflow. And further, in March 2019, so this is a CEO... Just to interrupt on a small point, the key person that you're talking about that departed Insolite with the documents, he didn't start working there until after the 2018 conference, right? No, so there were three relevant employees. Yeah, but one of them, Mr. Delaney, who is featured more prominently than the others in the briefs, was not there at the time. Just to confirm. So he was at least on board by summer 2019, where again, the prototype was displayed, the advertisement remained constant, Insolite actually sent lawyers to that conference, and so they again got eyes on the product there. And I think it just demonstrates that Insolite itself was linking up the fact that there was, in their words, a cloned product with the fact that there was access. And this is often the key fact that might be missing or could prevent the claim from accruing. Just the fact that you have a similar product might be enough, because it could be reverse engineered or something like that. But here, what Insolite said internally is, hey, our former employees, including very high-level people, are now centrally involved in the design of the competing product, and this is a real problem. We should pull IP. We should get our lawyers involved. We should request samples. And I think even under the Merck discovery standard, that as a matter of law demonstrates that Insolite was on notice of the claim, just as the District Court recognized by March 2019. May I spend just a minute on damages, or I'm happy to answer additional questions about the limitations period. So just a quick point on damages, because I want to be really clear about the nature of the problem here. The District Court awarded a permanent injunction which completely locks up the value of the trade secrets and makes sure that EOFLO can't receive any benefit from having access to those trade secrets on a going-forward basis. But in the District Court additionally ordered as unjust enrichment damages $26 million, which was meant to approximate the full cost of having independently developed all of the relevant trade secrets at issue here on appeal. And the reason that those are a duplication is because if you actually spend the cost to develop independently the trade secrets, that's what the $26 million would represent. Then what you get with that is the ability to use them going forward. That initial investment is — I mean, to some extent, those were permitted and occurred. And so why isn't the recovery of some of the costs attributed to those appropriate? So I don't think that the $26 million of avoided cost damages could possibly try to capture the very limited sales that had occurred in Korea and the EU. That was never Insulet's theory of damages in this case. And in fact, the evidence at trial that was undisputed — this is at Appendix 21183-84 — was that EOFLOW had, from those sales during the relevant time, generated only $3 million in revenue and actually never any profits. Profits were zero because EOFLOW had already invested tens of millions of dollars in the development of EO Patch 2, and it didn't have the product on the market long enough to ever recoup that initial investment. So I think that shows that you couldn't possibly say that this avoided cost damages measure was meant to try to target those discrete sales. And notably, Insulet itself, that wasn't its damages theory. It was kind of swinging for the fences here and trying to get simultaneously the permanent injunction that forever bars the ability to use these trade secrets, while also duplicating that by trying to get a monetary reward at the full cost. Well, can I — you talk about duplicating, but I'm going back to the statute again. And the statute treats them differently, the remedy. It talks about injunctions. It talks about damages for actual losses. And then there's this other category, damages for unjust enrichment. And it's talking, it seems to me, so tell me if I'm wrong, that unjust enrichment doesn't involve — it's about what the defendant gained. It's not what the other side lost. Is that kind of a fair characterization of unjust enrichment? Yes, with the tweak that sometimes what the defendant gained is meant to try to put a value on what the plaintiff lost. Yeah, but it's something different than based on what they lost. It's something different. And this goes to — I mean, whatever EOFLOW did, and even in the light of a permanent injunction, they derived some benefits, arguably. That's the question. They — did they decrease their research costs? Are they decreasing the costs going further, even though the trade secrets themselves are off the table? Wouldn't that be a fair characterization of what we're talking about here in terms of avoided damages? So conceivably, I think that a trade secret plaintiff could come in and try to prove that type of unjust enrichment. But that wasn't Insolite's theory of damages here. And I don't see any way to suggest that the full measure of — the full amount of what it would cost to independently develop the trade secrets could possibly try to capture that kind of discrete point you're making, Judge Prost, about the possibility of some marginal enrichment that might have occurred from not immediately putting those costs in up front. I think that would have to be a much lower measure of damages. And, you know, it was ultimately Insolite's decision how it wanted to litigate this case and what kind of damages it wanted to pursue. I would say as well, you mentioned that the statute contemplates you can have the award of both an injunction and damages, and I think that's true. But I'd point the Court to the Second Circuit's decision in the Sintel case and, most recently, the Fifth Circuit's decision in the CSC case, which we sent a 28-J letter about. Those are the two circuit courts that have most recently considered this issue of possible duplication between these remedies, both under the DTSA. And they articulate the relevant principles just as I've described them here. They make very clear that you might be able to have those remedies together when, for example, the defendant's use of the trade secrets entirely destroyed their value. So there is some additional harm to the plaintiff that you need to account for, or when you might be able to possibly measure, just as you touched on, Judge Prost, that discrete period of time before the injunction issued. But neither of them said you could award the full cost of avoided cost damages. Can I cover one more issue before we leave? No. On the DHF. Yes. Another major issue, at least for me in this case, is whether or not that satisfied the definition of trade secrets. Now, DHF is not included in this $29 million, right? That's right. So that's not going to be affected by our conclusion. But it is subject to the injunction. How would the injunction be affected, if at all, if we were to conclude against you on all the other issues, but that that was not a trade secret? What does that do to the actual injunction? I think what that would mean is that the portion of the injunction that prohibits EO flow from using the DHF on a going-forward basis would have to be removed from the injunction. Is there an overlap between that and the other categories of trade secrets? I imagine there is, right? Yes, there is. So the three other asserted trade secrets were alleged to be part of the DHF. You know, one of the problems here is that we don't actually know exactly what the DHF encompasses. In fact, that's our argument about how it wasn't sufficiently defined through the jury. No, I understand. I appreciate that. But Insolite has alleged that the DHF extended far beyond those three other asserted trade secrets and encompasses kind of all of the accumulated product knowledge. I think that's something, if that were the conclusion, the district court would have to sort. It would be up to the district court to sort out, but there's no way we can do that here. Well, right. So I think at that point, if you agree with us that that, as a matter of law, did not sufficiently define the trade secret, and, of course, last time this case was before this Court, it was a similar problem where it was just a hazy creeping of information that was advanced as an asserted trade secret, then I think the Court could say, as a matter of law, that this should not have been submitted to a jury and where no reasonable juror could have concluded this is protected and reverse on that basis with respect to the DHF. Of course, we'd hope for the Court to reverse with respect to all of the issues.  Counsel, could you make just a brief comment on the DHF, whether or not it's a trade secret? Absolutely. I appreciate the chance to do so, Judge Reyna. So the problem with the DHF as an asserted trade secret is that the outer meets and bounds of exactly what was never precisely defined for the jury or for us. This was kind of a shape-shifting trade secret throughout the course of the proceedings below, but by the time we got to trial, Insolite tried to claim that an exhibit that they introduced, Exhibit 2177, was the DHF. The problem with that is that their own witness, Julie Perkins, who testified about that asserted trade secret, acknowledged that the thing that was exhibited in court was only parts of the DHF. She conceded that there were certain parts of the DHF that were apparently within the trade secret definition but were not included in the exhibit, including things like test protocols, test reports, standard operating procedures, and so forth. So that meant that the thing in court was not the DHF. Now, Insolite's other argument has been that there's a regulatory definition of a DHF, so that gives notice. But the problem with that is, again, the thing that was claimed to be the trade secret DHF does not correspond to the regulatory definition. For example, the standard operating procedures are part of the trade secret DHF but appear nowhere in the regulation. And vice versa, there are aspects of the regulation that don't correspond with the categories of information. And what is the relevance of the regulation? Does the regulation compel that it's a trade secret? No, not at all.  So I think that so I understand Insolite to have fallen back on the regulation as a way to try to salvage this claim about the DHF because Insolite recognizes that the exhibit was not complete. But the problem with that is that the regulation couldn't provide the sufficient definiteness, especially in a circumstance where the thing alleged to be the trade secret doesn't actually correspond to the regulatory definition when you line those two things up against each other. So I think the court could conclude, again, as it did at the PI stage with respect to a similar problem, that ultimately this amounted to a sweeping claim of protection with respect to all of the product knowledge that went into the Omnipod, and that just isn't sufficient to create a precise definition of what was a protectable trade secret here. Okay. We'll give you two minutes to go about it. Mr. Kelly? Thank you, Your Honor. May it please the Court. I do want to begin with jurisdiction, if I may, because we obviously think that whichever court of appeals has jurisdiction should affirm the jury's verdict of willful malicious infringement, and we've submitted that that is the First Circuit for the simple reason that this case does not arise under the patent laws. We amended the complaint that resulted in the district court dismissing the patent claims without prejudice, and that, this Court has said, in cases like Chamberlain, is the test. In this case, because you look at the amended bleeding and you look at whether the amended bleedings arise under patent law, once the patent claims were dismissed without prejudice, this case ceased to arise under patent law. So we think the First Circuit has jurisdiction. The other side's rule, which is not supported by any case from any circuit, this Court or any of the regional circuits, which also have to confront this issue, it would enmesh both this Court and the regional circuits in very difficult patent statute of limitations questions just in order to figure out whether they have jurisdiction over any given case. Our rule is simple. It looks at the face of the judgment. In this case, the judgment does not bar relitigation of anything. It says in both cases, all cases. Breyer, it does, because the statute of limitations is run. Respectfully, no, Judge Dike. The judgment does not bar anything. The judgment does not bar relitigation of anything, and that is the test. The – and I would dispute the premise that the limitations period is run. But the question is, did the district court adjudicate the patent claims so that is the judgment that you're reviewing rest – does it rest in part on patent law? It does not, because the district court never answered any question of patent law. The claims were stayed for the entire duration of the case. Doesn't it matter whether the dismissal was with prejudice or not? It does. And in this case, the dismissal was, in boldface, all caps, without prejudice. It's the other side that is asking you to look behind that and say, well, it's really with prejudice, because if the claim were asserted, and if we timely asserted the statute of limitations, we would win. But that is not a proper jurisdictional inquiry, and there is no case from this court or any other court that applies that. And I would – and I would – Well, there are cases that apply that. Pardon? There are cases that rely on the statute of limitations running. In the sanctions context, but not the jurisdictional context. And you can see why that would make a difference. Jurisdictional rules should be clean and easy to apply, especially for the regional circuits when they are confronted with a, you know, question of patent statute of limitations. If that were the threshold for deciding whether they have jurisdiction, it would really enmesh them in questions that really should be for this court. So cases like Suralski that the other side cited are all about the sanctions context. We've pointed that out in our brief. I didn't see any response to that in their reply. So I disagree that the claim is time-borne, but more fundamentally, I disagree that that's the question that should matter for jurisdiction. Let's go on to the statute of limitations issue.  Let's assume hypothetically that we agree with you about Burke and that inquiry notice is not the right standard and the discovery standard is correct. But at the same time, under cases like C-TRAC, access plus similarity is sufficient as a matter of law to satisfy the discovery standard. Now, here looking at two of the trade secrets, the cannula trade secret and the cad files trade secret, put aside the other two. As I read the record, there is undisputed evidence from EOFL that the trade shows and the prospectus disclosed that the product had those features to it. And then I look to see whether there's any evidence to the contrary, and I didn't see any evidence to the contrary. So could you address that, please? Absolutely. So let me just note parenthetically, because you mentioned C-TRAC, I'm not sure that's even a UTSA case, because Texas had not adopted the UTSA at that point. The point is that, like, it doesn't apply to the same statutory language. So we'd be focused on when would you have discovered the misappropriation. And so you disagree that access and similarity is sufficient? So I think that you should look at cases like us, like Sokol from the Seventh Amendment. I don't know if that's what you mean, because I think that that could be used imprecisely. But so you're agreeing that that's the right stand? Yes, but the question is access to what? You have to have access to – because remember that the limitations period is applied trade secret by trade secret. That was a contested issue below. The district court resolved that in favor of going trade secret by trade secret. Your question asks to go trade secret by trade secret. And so the question would be, did they have access – do we know that they had access to the cannula trade secret? Remember that the cannula trade secret is not the existence of a cannula. It is not the existence of a soft cannula. It's not even the existence of a cannula with a nailhead design. It's how our cannula is constructed in a precise way to ensure – Only former employees had access to it, right? We didn't know that they had the documents with them that they gave to EOFLOW to pirate our invention. And that's the key point that Ms. Prelogger suggested, that there are things that we could have done. She did not suggest that any of them would have given us the necessary information to discover the misappropriation, and that's what the focus needs to be on, that we did not know that they had the CAD files. Let's put aside for the moment the access question and focus on the similarity question. It is the case with respect to those trade secrets that there is testimony from the EOFLOW witnesses that you could have determined that from the trade show and the prospectus. And I'm looking to see whether there was contrary testimony from your witness. Absolutely. I didn't see it. From multiple witnesses, including one of the defendants, page 20877. Okay, 20, which volume is that? 20877 is volume either three or four. Four, thank you. All right, so I would take you, are you at the page, Your Honor? 20877. That's right. So top right-hand corner, which is page 111, most of the way down. You can't see the method by which the cannula was manufactured by looking at these devices, right? I don't think so. No. And above that, the same questions for the ODA algorithm, the design history file. So recall that the sample at the end. So where's the testimony about the CAD file? I'm sorry? Where's the testimony about the CAD file? Okay, Mr. Malave didn't testify here about the CAD file.  Right, but the, let's see. I don't understand that the cannula trade secret is limited to the method of manufacturing, right? No, I disagree, Your Honor. It is just the method of manufacturing? It's the precise specifications and method of manufacturing. That's right. The precise specification of the dimensions of the cannula. So Ms. Prelogger suggested, and I do not know what she's basing this on, that you could identify the dimensions of the cannula by going to the trade show. That's just not correct, because the device displayed at the trade show had the cannula snipped off. I've got to deal with the testimony here. But the testimony was the cannula was snipped off of the version displayed at the trade show. There was no cannula. When you look at a trade secret, it informs you both what to do and what not to do, right? It can. Right. So a number of the trade secrets in this case identified errors and, you know, design problems that Insolite had to solve in developing this invention and spent millions of dollars, hundreds of millions of dollars, developing responses to those issues and compiling them and, you know, amassing that knowledge and including the very precise dimensions. So the testimony about the cannula. The dimensions of the final product. The dimensions of the final product, right? Yes, but the testimony, well, Your Honor, the testimony indicates that you could not reverse engineer the information about what it takes to manufacture the cannula from just opening up an Omnipod because the cannula is soft, it's flexible, and the dimensions change actually as the needle and the cannula are integrated with each other in the manufacturer. Let's talk about the cannula. Where is the testimony? There is testimony that you could determine whether the cannula files had been used in the product. Where is the testimony that you couldn't figure out whether the CAD file information was in the product? I'm not sure I agree with your characterization of what the other side's testimony says, that you could determine that the CAD files had been misappropriated by looking at the product. I think their testimony may say that you could see the exterior of the product so that you might But where's the testimony that you couldn't? That you couldn't see the interior? I unfortunately don't have the page number for this, but I'll tell you what it says. No, I want the page number. Okay. Okay, so footnote 2 of our brief on page 5 collects a number of page numbers for the proposition that these details, the CAD files, could not be gleaned from examining a physical sample. Okay, but you're not able to point us to the page of the appendix. You're asking specifically about the CAD files. Honestly, I don't understand the other side to have testimony to say that the contents of the CAD files, that it would be knowable by looking at the other side's device. Because, I mean, recall that the closest that you could come to the other side's device is sort of a foot away. The sample that they had had no cannula. It had a clear cover, but you still couldn't see all the way inside. What the CAD files display are extremely precise dimensions and integrations of parts. Like, you couldn't just glance down into a device and the jury heard testimony about what you could and could not see from several feet away looking into this. And more importantly, the jury had in front of it a sample of the same clear device that was at the trade show. Obviously, I don't have that here with me, but that was passed up and down in front of the jury. So the question is, what did they have access to and what similarity was Insulet on notice of? And I do not think that the other side can point to evidence that says that just looking at their device would give a reasonable observer such indisputable evidence that they had copied not just the exterior, not just sort of like the general configuration, but the interior workings down to the kind of fine degree that is reflected in the CAD files. Okay, do you want to go on to damages? Sure. And my friend also referred to the DHS, and I want to come back to that. Go ahead. You do that first. Either direction. Why don't we do damages? The basic point on damages is that the other side got their device to the market. And I think that your question, Judge, recognized this, that they got their device to market both in Korea and in Europe. And so that means that when you're looking at what benefit they gained from misappropriating our trade secrets kind of at the moment they were caught, they'd already gotten on the market. So in other words, if they'd done it themselves without the benefit of the misappropriated inventions, they would have had to spend a lot more money. And so I understand that their evidence says that they didn't make a profit. Well, lots of medical device companies don't make a profit initially. But what about their sales? I mean, how does the $29 million which was calculated on these three things, how does that dovetail with the sales that you mentioned in Europe and Korea? I think the short version is they lost a lot less money, or they were a lot less in the hole when they got on to the market, because they were able to skip the developments, large portions of the development stage by relying on the trade secrets. And so that's why, unlike in cases like Stintel, where the defendant had not actually finished developing its own competing product, and so you could prevent them from benefiting from their misappropriation simply by stopping them from continuing to rely on the trade secrets. But in the case of a company that's actually gotten a product to market and further caused harm to our trade secrets by, for example, submitting patent applications that would have made our trade secrets public. So the Second Circuit suggests in Stintel that it should matter whether there's a risk to the owner, in other words, something tangible damage to the owner of the trade secrets. I mean, I think that if you look at the text, those are independent of each other, and I don't think that we're required to show that. But if we were required to show that, we did, because of the not just exploitation of our trade secrets, but the risk that they would become public and lose their value. The problem is the district court didn't rely on the foreign sales. The district court's theory as to why he could award the avoided costs seems to me pretty thin. He talks about concerns about the merger, which really you're not really arguing today and don't make much sense. It may be that there was a ground that he could have adopted, but he didn't or she didn't. He did conclude that the jury's award rested on partly on avoided costs and partly on other measures of the trade secrets value. The point about the merger, that went to the other component of the damages. That's what he reduced. In other words, when reducing the damages award, he took that off the table, because you could tell that the jury had credited our damages evidence, which included But he didn't rely on the sales that we've been talking about, right? He didn't rely on the sales in the sense that it It's justifying the avoided costs. Right, because the reason for that is, and this really goes fundamentally to why this rule makes sense, that the rule the other side is arguing for is that if you have, you know, because they wouldn't allow gross revenue as a measure of damages either. Right. They would say, well, we were losing money. It wasn't profitable revenue. So there should be no damages. And so their answer is that when you have a product that is sold overseas, so it's not competing directly in the same market, if it doesn't cause the trade secret owner immediate damage, that you can essentially exploit it until you get caught and pay no damages. That is not how unjust enrichment works. If you borrow without permission, you know, the plaintiff's asset and you make money off of it, or one way of making money is avoiding spending money that you otherwise would have to spend. Then you have to disgorge that benefit in order to do equity and prevent you from enjoying the fruits of your misappropriation. I think that's really black letter law. And I think the restatement provisions and treatises in Sintel give a nice overview of why this is. On the DHF, unless the Court has any further questions about that point, the other side has not given any actual problem with the DHF case that we presented. We presented a discrete set of documents, a knowable, finite set of documents. We explained why not all of the contents were confidential, because that's how a trade secret – sorry, that is how a DHF, a design history file, works. So Judge Prost, to your question, what is the relevance of the regulation about a design history file, that is the relevance. In other words, why do we have a design history file, and why does it have value as a compilation? Now, why did we submit these nine binders from 2012? The answer is because that's when Mr. Hamm put the design history file on a thumb drive. And that wasn't – he was doing it in the course of his employment. We didn't know that he'd taken the thumb drive with him. He signed exit paperwork saying that he hadn't. But the point is that the design history file itself has value in its entirety. He deleted a bunch of stuff. We weren't able to get his original files. And so that's why we had to reconstruct it as Exhibit 2177. So the other side wasn't surprised by what the contents were. In terms of whether the contents were protected – The fact they weren't surprised doesn't make it a trade secret. Correct. But I think there's ample evidence, and I'm happy to take you through it category by category. Within the design history file, without dispute, there is the two types of failure mode effects analysis. And we established – And it wasn't presented to the jury that way, right? We presented a bunch of discrete, identifiable components of the design history file. We explained why they were secret, why they derive value from being secret, how we established – It was presented as though those were separate secrets? We lined each of them up. We explained both that they are part of the design history file. But the theory was that the whole file was a trade secret, right? Not that the whole file was secret, Your Honor. That the whole file was a compilation trade secret that included both confidential and non-confidential documents. The jury instruction on that is quite detailed. The other side has not objected to it, to the concept that you can have a compilation trade secret that includes both confidential and non-confidential information that derives value from its existence as a discrete thing. Medtronic was asking, do you have a design history file? It's a question that caused the other side to go into what they themselves called pants-on-fire emergency mode, appendix 20895. What case says that non-secret information can be a trade secret? I refer you to the Allstate case from the First Circuit, distinguishing the TLS case on this very point, that a compilation of information can include non-secret information if it derives value from being a compilation. The other side has not objected to that premise. That is what the jury instruction says. There are detailed instructions on how to treat compilation trade secrets a bit differently from other trade secrets. The other side didn't object to those. And the point is that having a design history file, when you're going to submit your device for clearance by the FDA or when you're going to sell your company to Medtronic and you're undergoing due diligence, having a design history file is essential and they needed quickly to assemble a design history file with the kind of backup that they would have had if they developed the product themselves instead of stealing from Insulet. And so we presented a number of—I don't think it was incumbent on us to establish that every single document within the DHF was both secret and misappropriated. We went through six different categories, all within the DHF, all secret, all derived value from being secret, and all misappropriated. And I'm happy to walk you through testimony on each one of those categories, the design mode failure analysis, the hardware design document, and frankly, the entire design history file. At page 20996 and page 21023, we have evidence that the DHF as a whole is valuable. Can I just ask you—I know you're not going to like this question, but let me just ask it, which is if we were to disagree with you on the DHF, what happens with respect to the permanent injunction? I think your question rightly recognizes that that's the only part of the judgment that turns on the DHF, and I think the only— And there's an overlap between the categories. I mean, is there an overlap between what's in the DHF and what's in the other stuff? Yes, and so I think that it probably would be simplest to ask the district court to revise the injunction, but if we look at the injunction together, you'll see that it defines the trade secrets, and the trade secrets are the four that the jury found were valid and infringed. And then the operative provisions of the injunction all refer to the trade secrets, kind of the defined term. So it's possible that it would be as simple as removing the DHF. We obviously don't think you should do that because, after all, that part of this appeal is under the J. Mall standard, and there's really quite ample evidence. If the jury was instructed correctly, which the other side appears to concede, that the DHF, both as a whole and a number of the components that we presented to the jury, were secret. But you don't expect us to divvy that up. I mean, we're not going to decide here on appeal if we didn't think essentially the entirety was a trade secret. We don't have to go through and say, but maybe this part was and maybe this part was. That's not our job on appeal, right? Well, your job on appeal is to ask whether the jury, as instructed, could have found from the trial evidence that the DHF was misappropriated. And recall that the compilation trade secret instruction says a substantial part. And so I do think that it would not be enough to say, here is a thing that it is not clear whether it's in the DHF or is not. And really all of opposing counsel's arguments were, both in the brief and today, were along those lines. Here are some things that might be considered in a DHF or might not be. But the question was not, were they in Exhibit 2177? Do they derive value from being secret? And were they misappropriated? And we showed for a substantial portion of the DHF, which is all our burden consists of, that all of those elements were met. Okay. Thank you. Thank you, Your Honors. Ms. Prelogar, you've got two minutes. Thank you, Your Honors. I'll begin with a quick factual clarification. Judge Prost, you asked about the employees and when they had left Insolite and when they started working for EOFLOW. All of the relevant employees had started by 2017, and that includes Diani, who was the central architect of the CAD files and of the Omnipod. So I just wanted to clarify that. That appears in Appendix 21065. On the statute of limitations. I'm sorry. Yes. Yes. On the statute of limitations, I want to say that if you put yourself in Congress's shoes back in 2016, Insolite says Congress just wanted to embrace the Merck standard, that discovery rule. But it would have been inexplicable to instead replicate verbatim the language from the UTSA that had been subject to this inquiry notice interpretation in the lower courts and not use the language from Merck, which was very different. That statute just referred to discovery full stop. But even under that discovery rule, as Judge Dyke noted, it requires access and similarity in order to adequately allege and file a complaint for trade secret misappropriation. And there are a number of cases that stand for that proposition, including Leggett and Platt from this court and, of course, the C-TRAX case that did involve a Texas state law claim that the statutory language there was virtually identical to the DTSA language. It's very clear under that case law, you don't need to know every single detail to be able to allege trade secret misappropriation. And it focuses on similar products. You know, Insolite is saying, oh, you couldn't necessarily see every jot and tittle of the information asserted to be a secret. But, of course, if you can just see that in a product, it's unclear how that would qualify it for trade secret protection in the first place. Instead, the cases always focus on the idea that you've got a similar product and then you've got employees, former employees, who knew all of the relevant confidential information that went into building that product that has regularly been found to provide a basis to state a claim and, therefore, demonstrates that the statute of limitations has run. Quickly, on damages, there is no indication that the damages theory was tied to any foreign sales. And there's no way that you could get to $26 million from that amount. Instead, that theory of avoided cost damages, awarding the full measure of what it would have cost to independently develop the trade secrets, duplicates the injunction that prevents the overflow from using those very same trade secrets. And just finally, on jurisdiction, this Court's decision in Chamberlain says that the dividing line is whether the patent claims fell out of the case with or without prejudice, and it doesn't matter what label the district court used. It's a functional analysis. There are any number of cases from this Court and other courts saying that when claims are dismissed after the statute of limitations has run, that is effectively with prejudice. And a contrary rule would invite the very kind of jurisdiction manipulation we might be seeing here, where it's only once the claims come up on appeal and you're thinking about appellate issues that Insolite tried to dismiss these patent claims, but it did it after the statute of limitations ran, and, therefore, this Court's jurisdiction is secure. So we'd ask the Court to reverse.  Thank you. Thank you.